DAVID W. SCOFIELD - 4140
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah 84093-6160
Telephone:      (801) 322-2002
Facsimile:      (801) 912-0320
Email:          dws@psplawyers.com

**[Additional counsel on signature pages]**
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| MATTHEW KESSMAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br>   vs. <br><br> MYRIAD GENETICS, INC., MARK CHRISTOPHER CAPONE, PETER D. MELDRUM, R. BRYAN RIGGSBEE, and JAMES S. EVANS, <br><br> Defendants | Case No. 2:18-cv-00336-PMW <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> JURY TRIAL DEMANDED <br><br> Honorable Paul M. Warner |

Plaintiff Matthew Kessman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Myriad Genetics, Inc. ("Myriad" or the "Company"),

analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Myriad between August 13, 2014 and March 12, 2018, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Myriad develops and markets molecular diagnostic products to provide physicians with information to help guide the care of their patients, to prevent disease, delay the onset of disease, and catch disease at an early stage.  Myriad purports to employ a variety of proprietary techniques designed to provide an understanding of the genetic basis of disease and the role of genes in the onset, progression and treatment of disease.

3.      Founded in 1991, the Company is headquartered in Salt Lake City, Utah, and its stocks trade on the NASDAQ Global Select ("NASDAQ") under the ticker symbol "MYGN."

4.      Established in 1978, the Healthcare Common Procedure Coding System ("HCPCS") provides a standardized coding system for describing the specific items and services provided in healthcare.  HCPCS dictates the billing codes in the claims that physicians, healthcare providers and suppliers, such as Myriad, submit to the Centers for Medicare and Medicaid Services ("CMS").  The National Correct Coding Initiative ("NCCI"), a CMS program designed to prevent improper payment of procedures that should not be submitted together,

provides further instruction with respect to correct billing practices.  Among other things, the NCCI provides that billing documents must contain numerical code pairs, reflected in adjacent columns, identifying the services provided.  As CMS has stated in its billing guidance documents, "[t]he underlying principle is that the second code defines a subset of the work of the first code.  Reporting the codes separately is inappropriate.  Separate reporting would trigger a separate payment and would constitute double billing."

5.      Pursuant to NCCI, these code pairs fall into two categories: (i) "modifier"—*i.e.*, those for which the appropriate use of a modifier allows the code pair to be reported together; and (ii) "no modifiers"—*i.e.*, those code pairs that should never be reported together, regardless of modifiers.

6.      The most widely used HCPCS modifier is -59, which is used to indicate that a code represents a service that is separate and distinct from another service with which it would usually be considered to be bundled (a "Distinct Procedural Service").  Because modifier -59 can be broadly applied to code pairs, CMS has issued guidance addressing its correct application and potential for abuse, stating, in part:

> Some providers incorrectly consider [-59] to be the "modifier to use to bypass (NCCI)."  ***This modifier is associated with considerable abuse and high levels of manual audit activity; leading to reviews, appeals and even civil fraud and abuse cases.***
>
> The primary issue associated with the -59 modifier is that it is defined for use in a wide variety of circumstances, such as to identify:
>
> - Different encounters;
> - Different anatomic sites; and
> - Distinct service.
>
> The -59 modifier is
>
> - Infrequently (and usually correctly) used to identify a separate encounter;

- Less commonly (and less correctly) used to define a separate anatomic site; and
- More commonly (and frequently incorrectly) used to define a distinct service.

*The -59 modifier often overrides the edit in the exact circumstances for which CMS created it in the first place.* CMS believes that more precise coding options coupled with increased education and selective editing is needed to reduce the errors associated with this overpayment.

(Emphases added.)

7.    In September 2013, Myriad launched its proprietary 25-gene myRisk Hereditary Cancer test ("myRisk"), which includes testing for multiple genes associated with cancer, including BRCA1 and BRCA2, both of which are associated with breast and ovarian cancer.

8.    BRCA1 and BRCA2 genetic testing—specifically, BRCA sequencing and BRCA duplication-deletion—are represented in HCPCS by codes 81211 and 81213.  CMS has made it clear that codes 81211 and 81213 are *not* correctly used together.   In August 2015, Dr. Steve Phurrough of CMS unequivocally stated:

If they [a lab] were to do both of these codes, then correct coding, ***non-fraudulent*** coding would be the new code 81162.  And ***to code both 81211 and 81213, when you did both of them, on the same patient, the same sample, would be incorrect coding.***

(Emphases added.)

Likewise, a "Correct Coding" edit file issued by CMS through its website blocks the entry of 81211 and 81213 as a code pair, unless a coder directly overrides the block by entering the -59 modifier.

9.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Myriad made false and/or misleading statements and/or failed to disclose that: (i) Myriad was submitting false or otherwise improper claims for payment under Medicare and Medicaid for the

Company's hereditary cancer testing; (ii) the foregoing conduct would foreseeably subject Myriad to heightened regulatory scrutiny and/or enforcement action; (iii) Myriad's revenues from its hereditary cancer testing were in part the product of improper conduct and unlikely to be sustainable; and (iv) as a result, Myriad's public statements were materially false and misleading at all relevant times.

10.     On March 12, 2018, post-market, Myriad disclosed that it had received a subpoena from the Department of Health and Human Services, Office of Inspector General, in connection with "an investigation into possible false or otherwise improper claims submitted for payment under Medicare and Medicaid," specifically relating to Myriad's hereditary cancer testing.  The subpoena covers a time period from January 1, 2014—less than four months after the September 2013 launch of Myriad's myRisk test—through the date of the subpoena's issuance.

11.     On this news, Myriad's share price fell $4.01, or 12.14%, to close at $29.01 on March 13, 2018.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

15.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Myriad's principal executive offices are located within this Judicial District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17.     Plaintiff, as set forth in the accompanying Certification, purchased Myriad securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

18.     Defendant Myriad is incorporated in Delaware, and the Company's principal executive offices are located at 320 Wakara Way, Salt Lake City, Utah 84108.   Myriad's securities trade on the NASDAQ under the ticker symbol "MYGN."

19.     Defendant Mark Christopher Capone ("Capone") has served as Myriad's Chief Executive Officer ("CEO") and President since July 2015.

20.     Defendant Peter D. Meldrum ("Meldrum") served as Myriad's CEO and President from November 1991 to June 2015.

21.     Defendant R. Bryan Riggsbee ("Riggsbee") has served as Myriad's Chief Financial Officer ("CFO") and Treasurer since June 2014 and as Myriad's Executive Vice President since October 2014.

22.     Defendant James S. Evans served as Myriad's CFO from November 2007 until October 2014.

23.     The Defendants referenced above in ¶¶ 19-22 are sometimes referred to- herein as the "Individual Defendants."

24.     The Individual Defendants possessed the power and authority to control the contents of Myriad's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Myriad develops and markets molecular diagnostic products to provide physicians with information to help guide the care of their patients, to prevent disease, delay the onset of disease, and catch disease at an early stage.  Myriad purports to employ a variety of proprietary techniques designed to provide an understanding of the genetic basis of disease and the role of genes in the onset, progression and treatment of disease.

26.     Established in 1978, HCPCS provides a standardized coding system for describing the specific items and services provided in healthcare.  HCPCS dictates the billing codes in the claims that physicians, healthcare providers and suppliers, such as Myriad, submit to the CMS.  The NCCI provides further instruction with respect to correct billing practices.

Among other things, the NCCI provides that billing documents must contain numerical code pairs, reflected in adjacent columns, identifying the services provided.  As CMS has stated in its billing guidance documents, "[t]he underlying principle is that the second code defines a subset of the work of the first code.  Reporting the codes separately is inappropriate.  Separate reporting would trigger a separate payment and would constitute double billing."

27.     Pursuant to NCCI, these code pairs fall into two categories: (i) "modifier"—*i.e.*, those for which the appropriate use of a modifier allows the code pair to be reported together; and (ii) "no modifiers"—*i.e.*, those code pairs that should never be reported together, regardless of modifiers.

28.     The most widely used HCPCS modifier is -59, which is used to indicate that a code represents a service that is separate and distinct from another service with which it would usually be considered to be bundled (a "Distinct Procedural Service").  Because modifier -59 can be broadly applied to code pairs, CMS has issued guidance addressing its correct application and potential for abuse, stating, in part:

> Some providers incorrectly consider [-59] to be the "modifier to use to bypass (NCCI)." ***This modifier is associated with considerable abuse and high levels of manual audit activity; leading to reviews, appeals and even civil fraud and abuse cases.***
>
> The primary issue associated with the -59 modifier is that it is defined for use in a wide variety of circumstances, such as to identify:
>
> - Different encounters;
> - Different anatomic sites; and
> - Distinct service.
>
> The -59 modifier is
>
> - Infrequently (and usually correctly) used to identify a separate encounter;
> - Less commonly (and less correctly) used to define a separate anatomic site; and

- More commonly (and frequently incorrectly) used to define a distinct service.

*The -59 modifier often overrides the edit in the exact circumstances for which CMS created it in the first place.*  CMS believes that more precise coding options coupled with increased education and selective editing is needed to reduce the errors associated with this overpayment.

(Emphases added.)

29.     In September 2013, Myriad launched its proprietary 25-gene myRisk Hereditary Cancer test, which includes testing for multiple genes associated with cancer, including BRCA1 and BRCA2, both of which are associated with breast and ovarian cancer.

30.     BRCA1 and BRCA2 genetic testing—specifically, BRCA sequencing and BRCA duplication-deletion—are represented in HCPCS by codes 81211 and 81213.  CMS has made it clear that codes 81211 and 81213 are *not* correctly used together.  In August 2015, Dr. Steve Phurrough of CMS unequivocally stated:

> If they [a lab] were to do both of these codes, then correct coding, *non-fraudulent* coding would be the new code 81162.  And *to code both 81211 and 81213, when you did both of them, on the same patient, the same sample, would be incorrect coding.*

(Emphases added.)

Likewise, a "Correct Coding" edit file issued by CMS through its website blocks the entry of 81211 and 81213 as a code pair, unless a coder directly overrides the block by entering the -59 modifier.

**Materially False and Misleading Statements Issued During the Class Period**

31.     The Class Period begins on August 13, 2014, when Myriad filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2014 (the "2014 10-K").  For the quarter, Myriad reported net income of $33.63 million, or $0.43 per diluted share, on revenue of $188.77 million,

compared to net income of $44.08 million, or $0.53 per diluted share, on revenue of $174.12 for

the same period in the prior year.  For fiscal year 2014, Myriad reported net income of $176.23

million, or $2.25 per diluted share, on revenue of $778.22, compared to net income of $147.14,

or $1.77 per diluted share, on revenue of $613.17 for fiscal year 2013.

32.     In the 2014 10-K, Myriad stated that "myRisk Hereditary Cancer accounted for

6.9% of our total revenue during the year ended June 30, 2014."

33.     In the 2014 10-K, Myriad made only the following nonspecific representations as

to its compliance with applicable laws and regulations fraud and improper billing practices:

_Federal and State Fraud and Abuse Laws_

A variety of federal laws prohibit fraud and abuse involving state and federal
health care programs, such as Medicare and Medicaid. These laws are interpreted
broadly and enforced aggressively by various state and federal agencies, including
CMS, the Department of Justice, the Office of Inspector General for the
Department of Health and Human Services ("OIG"), and various state agencies.
In addition, the Medicare and Medicaid programs increasingly use a variety of
contractors to review claims data and to identify improper payments as well as
fraud and abuse. Any overpayments identified must be repaid to the Medicare
program unless a favorable decision is obtained on appeal. In some cases, these
overpayments can be used as the basis for an extrapolation, by which the error
rate is applied to a larger universe of claims, and which can result in even higher
repayments.

***

_State and Federal Prohibitions on False Claims_

The federal False Claims Act imposes liability on any person or entity that,
among other things, knowingly presents, or causes to be presented, a false or
fraudulent claim for payment to the federal government. Under the False Claims
Act, a person acts knowingly if he has actual knowledge of the information or acts
in deliberate ignorance or in reckless disregard of the truth or falsity of the
information. Specific intent to defraud is not required. The qui tam provisions of
the False Claims Act allow a private individual to bring an action on behalf of the
federal government and to share in any amounts paid by the defendant to the
government in connection with the action. Penalties include payment of up to
three times the actual damages sustained by the government, plus civil penalties
of between $5,500 and $11,000 for each false claim, as well as possible exclusion

from the federal health care programs. In addition, various states have enacted similar laws modeled after the False Claims Act that apply to items and services reimbursed under Medicaid and other state health care programs, and, in several states, such laws apply to claims submitted to any payor.

\*\*\*

*Failure to comply with government laws and regulations related to submission of claims for our services could result in significant monetary damages and penalties and exclusion from the Medicare and Medicaid programs and corresponding foreign reimbursement programs.*

We are subject to laws and regulations governing the submission of claims for payment for our services, such as those relating to: coverage of our services under Medicare, Medicaid and other state, federal and foreign health care programs; the amounts that we may bill for our services; and the party to which we must submit claims. Our failure to comply with applicable laws and regulations could result in our inability to receive payment for our services or in attempts by government healthcare programs, such as Medicare and Medicaid, to recover payments already made. Submission of claims in violation of these laws and regulations can result in recoupment of payments already received, substantial civil monetary penalties, and exclusion from government health care programs, and can subject us to liability under the federal False Claims Act and similar laws. The failure to report and return an overpayment to the Medicare or Medicaid program within 60 days of identifying its existence can give rise to liability under the False Claims Act. Further, a government agency could attempt to hold us liable for causing the improper submission of claims by another entity for services that we performed if we were found to have knowingly participated in the arrangement at issue.

34.     The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Evans and Meldrum, stating, in relevant part, that the 2014 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

35.     On November 5, 2014, Myriad filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q1 2015 10-Q").  For the quarter, Myriad reported net income of $15.98 million, or $0.21 per diluted share, on revenue of $168.84 million, compared to net income of $55.47 million, or $0.68 per diluted share, on revenue of $202.47 million for the same period in the prior year.

36.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Meldrum and Riggsbee, stating, in relevant part, that the Q1 2015 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

37.     On February 4, 2015, Myriad filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2014 (the "Q2 2015 10-Q").  For the quarter, Myriad reported net income of $24.03 million, or $0.32 per diluted share, on revenue of $184.39 million, compared to net income of $50.36 million, or $0.66 per diluted share, on revenue of $204.06 million for the same period in the prior year.

38.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Meldrum and Riggsbee, stating, in relevant part, that the Q2 2015 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make

the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

39.     On May 6, 2015, Myriad filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q3 2015 10-Q").  For the quarter, Myriad reported net income of $21.48 million, or $0.29 per diluted share, on revenue of $179.99 million, compared to net income of $36.77 million, or $0.48 per diluted share, on revenue of $182.92 million for the same period in the prior year.

40.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Meldrum and Riggsbee, stating, in relevant part, that the Q3 2015 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

41.     On August 12, 2015, Myriad filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2015 (the "2015 10-K").  For the quarter, Myriad reported net income of $18.7 million, or $0.26 per diluted share, on revenue of $189.9 million, compared to net income of $33.63 million, or $0.43 per diluted share, on revenue of $188.77 million for the same period in the prior

year.  For fiscal year 2015, Myriad reported net income of $80.2 million, or $1.08 per diluted share, on revenue of $723.10, compared to net income of $176.23 million, or $2.25 per diluted share, on revenue of $778.22 million for fiscal year 2014.

42.     In the 2015 10-K, Myriad stated that "[w]e believe the global market for myRisk Hereditary Cancer and all of our hereditary cancer tests is approximately $5 billion annually."

43.     In the 2015 10-K, Myriad again made only nonspecific representations, nearly identical in substance to those referenced *supra* at ¶ __, as to its compliance with applicable laws and regulations fraud and improper billing practices.

44.     The 2015 10-K contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the 2015 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

45.     On November 4, 2015, Myriad filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q1 2016 10-Q").  For the quarter, Myriad reported net income of $30.30 million, or $0.42 per diluted share, on revenue of $183.5 million, compared to net income of $15.98 million, or $0.21 per diluted share, on revenue of $168.84 million for the same period in the prior year.

46.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the Q1 2016 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

47.     On February 3, 2016, Myriad filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2015 (the "Q2 2016 10-Q").  For the quarter, Myriad reported net income of $37.10 million, or $0.50 per diluted share, on revenue of $193.3 million, compared to net income of $24.03 million, or $0.32 per diluted share, on revenue of $184.39 million for the same period in the prior year.

48.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the Q2 2016 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

49.     On May 4, 2016, Myriad filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q3 2016 10-Q").  For the quarter, Myriad reported net income of $34.5 million, or $0.47 per diluted share, on revenue of $190.5 million, compared to net income of $21.48 million, or $0.29 per diluted share, on revenue of $179.99 million for the same period in the prior year.

50.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the Q3 2016 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

51.     On August 10, 2016, Myriad filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2016 (the "2016 10-K").  For the quarter, Myriad reported net income of $23.4 million, or $0.32 per diluted share, on revenue of $186.5 million, compared to net income of $18.7 million, or $0.26 per diluted share, on revenue of $189.9 million for the same period in the prior year.  For fiscal year 2016, Myriad reported net income of $125.3 million, or $1.71 per diluted share, on revenue of $753.8 million, compared to net income of $80.2 million, or $1.08 per diluted share, on revenue of $723.10 million for fiscal year 2015.

52.     In the 2016 10-K, Myriad stated that "[w]e believe the global market for myRisk Hereditary Cancer and all of our hereditary cancer tests is approximately $5 billion annually."

53. In the 2016 10-K, Myriad again made only nonspecific representations, nearly identical in substance to those referenced *supra* at ¶ __, as to its compliance with applicable laws and regulations fraud and improper billing practices.

54. The 2016 10-K contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the 2016 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

55. On November 2, 2016, Myriad filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q1 2017 10-Q"). For the quarter, Myriad reported a net loss of $1.2 million, or $0.02 per diluted share, on revenue of $177.5 million, compared to net income of $30.3 million, or $0.42 per diluted share, on revenue of $183.5 million for the same period in the prior year.

56. The Q1 2017 10-Q contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the Q1 2017 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the

financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

57.     On February 8, 2017, Myriad filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2017 (the "Q2 2017 10-Q"). For the quarter, Myriad reported net income of $5.9 million, or $0.09 per diluted share, on revenue of $196.5 million, compared to net income of $37.1 million, or $0.50 per diluted share, on revenue of $193.3 million for the same period in the prior year.

58.     The Q2 2017 10-Q contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the Q2 2017 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

59.     On May 3, 2017, Myriad filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q3 2017 10-Q"). For the quarter, Myriad reported net income of $4.2 million, or $0.06 per diluted share, on revenue of $196.9 million, compared to net income of $34.5 million, or $0.47 per diluted share, on revenue of $190.5 million for the same period in the prior year.

60.     The Q3 2017 10-Q contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the Q3 2017 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make

the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

61.     On August 9, 2017, Myriad filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2017 (the "2017 10-K").  For the quarter, Myriad reported net income of $12.9 million, or $0.19 per diluted share, on revenue of $200.5 million, compared to net income of $23.4 million, or $0.32 per diluted share, on revenue of $186.5 million for the same period in the prior year.  For fiscal year 2017, Myriad reported net income of $21.8 million, or $0.32 per diluted share, on revenue of $771.4 million, compared to net income of $125.3 million, or $1.71 per diluted share, on revenue of $753.8 million for fiscal year 2016.

62.     In the 2017 10-K, Myriad stated that "[w]e believe the global market for myRisk Hereditary Cancer and all of our hereditary cancer tests is approximately $5 billion annually."

63.     In the 2017 10-K, Myriad again made only nonspecific representations, nearly identical in substance to those referenced *supra* at ¶ __, as to its compliance with applicable laws and regulations fraud and improper billing practices.

64.     The 2017 10-K contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the 2017 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other

financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

65.     On November 8, 2017, Myriad filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2017 (the "Q1 2018 10-Q").  For the quarter, Myriad reported net income of $81.1 million, or $1.15 per diluted share, on revenue of $190.2 million, compared to a net loss of $1.2 million, or $0.02 per diluted share, on revenue of $177.5 million for the same period in the prior year.

66.     The Q1 2018 10-Q contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the Q1 2018 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

67.     On February 7, 2018, Myriad filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2017 (the "Q2 2018 10-Q").  For the quarter, Myriad reported net income of $32.1 million, or $0.45 per diluted share, on revenue of $194 million, compared to net income of $5.9 million, or $0.09 per diluted share, on revenue of $196.5 million for the same period in the prior year.

68.     The Q2 2018 10-Q contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the Q2 2018 10-Q "does not

contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

69.    The statements referenced in ¶¶ __-__ above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Myriad was submitting false or otherwise improper claims for payment under Medicare and Medicaid for the Company's hereditary cancer testing; (ii) the foregoing conduct would foreseeably subject Myriad to heightened regulatory scrutiny and/or enforcement action; (iii) Myriad's revenues from its hereditary cancer testing were in part the product of improper conduct and unlikely to be sustainable; and (iv) as a result, Myriad's public statements were materially false and misleading at all relevant times.

## **The Truth Begins to Emerge**

70.    On March 12, 2018, post-market, Myriad filed a disclosure on Form 8-K with the SEC, stating, in relevant part:

> The Company recently received a Subpoena from the Department of Health and Human Services, Office of Inspector General, in connection with an ***investigation into possible false or otherwise improper claims submitted for payment under Medicare and Medicaid***. The Subpoena requested that the Company produce documents relating primarily to the Company's billing to government-funded healthcare programs for the Company's hereditary cancer testing. The time period covered by the Subpoena is January 1, 2014 through the date of issuance of the Subpoena.

71.     On this news, Myriad's share price fell $4.01, or 12.14%, to close at $29.01 on March 13, 2018.

72.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

73.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Myriad common shares traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

74.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Myriad common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Myriad or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

76.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Myriad;

- whether Defendants caused Myriad to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Myriad securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

79.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Myriad common shares are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and

- Plaintiff and members of the Class purchased and/or sold Myriad common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

80.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

81.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Against All Defendants**

82.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

83.     This Count is asserted against Myriad and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

84.     During the Class Period, Myriad and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

85.     Myriad and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Myriad common shares during the Class Period.

86.     Myriad and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Myriad were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true

facts of Myriad, their control over, and/or receipt and/or modification of Myriad allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Myriad, participated in the fraudulent scheme alleged herein.

87.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Myriad personnel to members of the investing public, including Plaintiff and the Class.

88.    As a result of the foregoing, the market price of Myriad common shares was artificially inflated during the Class Period.  In ignorance of the falsity of Myriad's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Myriad common shares during the Class Period in purchasing Myriad common shares at prices that were artificially inflated as a result of Myriad's and the Individual Defendants' false and misleading statements.

89.    Had Plaintiff and the other members of the Class been aware that the market price of Myriad common shares had been artificially and falsely inflated by Myriad's and the Individual Defendants' misleading statements and by the material adverse information which Myriad's and the Individual Defendants did not disclose, they would not have purchased Myriad's common shares at the artificially inflated prices that they did, or at all.

90.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

91.     By reason of the foregoing, Myriad and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Myriad common shares during the Class Period.

**COUNT II**

**<u>Violation of Section 20(a) of The Exchange Act Against The Individual Defendants</u>**

92.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

93.     During the Class Period, the Individual Defendants participated in the operation and management of Myriad, and conducted and participated, directly and indirectly, in the conduct of Myriad's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

94.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Myriad's financial condition and results of operations, and to correct promptly any public statements issued by Myriad which had become materially false or misleading.

95.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Myriad disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Myriad to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Myriad within the meaning of Section 20(a)

of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Myriad common shares.

96.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Myriad.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 20, 2018.

Respectfully submitted,

PETERS|SCOFIELD
*A Professional Corporation*


/s/ David W. Scofield
DAVID W. SCOFIELD



(Additional counsel on next page)

**POMERANTZ, LLP**

*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman
(pro hac vice application forthcoming)
J. Alexander Hood II
(pro hac vice application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
(pro hac vice application forthcoming)
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, _MATTHEW KESSMAN_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Myriad Genetics, Inc. ("Myriad" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Myriad securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Myriad securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Myriad securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

{00272724;1 }

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Executed** ___4/14/18_____
        **(Date)**


_Matthew Kossman_____
          **(Signature)**


MATTHEW KESSMAN_____
        **(Type or Print Name)**

{00272724;1 }

**MYRIAD GENETICS, INC (MYGN)**                                       **Kessman, Matthew**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|------|------------------|------------------------|------------------------|
| 9/28/2017 | Purchase | 100 | $36.1990 |