## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

|  |  |
|---|---|
| MATTHEW KESSMAN, Individually and on Behalf of All Others Similarly Situated, | Case No.  **2:18-cv-00336** |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| v. |  |
| MYRIAD GENETICS, INC., MARK CHRISTOPHER CAPONE, PETER D. MELDRUM, R. BRYAN RIGGSBEE, and JAMES S. EVANS, | **<u>JURY TRIAL DEMANDED</u>** |
| Defendants. |  |

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    JURISDICTION AND VENUE ....................................................................... 4

III.   PARTIES ........................................................................................................... 5

IV.    SUBSTANTIVE ALLEGATIONS ................................................................. 6

       A.    Company Background ........................................................................... 6

       B.    Myriad's BRCA1 and BRCA2 Testing ............................................... 6

       C.    The HCPCS Coding System ................................................................ 8

       D.    Coding of Myriad's Genetic Tests ..................................................... 10

       E.    Myriad Systematically Overbilled Medicare for Its Testing ............... 11

       F.    Defendants Repeatedly Misled Investors by Failing To Disclose that
             the Company Systematically Had Overbilled Medicare and So Faced
             Massive Fines and Banning from Medicare ....................................... 15

       G.    Upon Revelation of Defendants' Fraud, Myriad's Stock Price Dropped ............. 16

V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................... 17

VI.    ADDITIONAL SCIENTER ALLEGATIONS ............................................... 22

VII.   CLASS ACTION ALLEGATIONS ............................................................... 25

VIII.  COUNT ONE ................................................................................................. 27

IX.    COUNT TWO ................................................................................................ 29

X.     PRAYER FOR RELIEF ................................................................................. 30

XI.    JURY TRIAL DEMANDED ......................................................................... 30

i

Lead Plaintiffs Ethan Silverman and David K. Higgins ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Myriad Genetics, Inc. ("Myriad" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Myriad securities between May 7, 2014 and March 12, 2018, both dates inclusive (the "Class Period").  Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    Myriad develops and markets genetic diagnostic products for use by physicians. During the Class Period, Myriad repeatedly misled investors by stating unequivocally that the Company was in full compliance with all laws and regulations governing its billing practices, when in fact, the Company was systematically overbilling Medicare for its most frequently

ordered products, and so was exposing the Company to hundreds of millions of dollars of liability under the False Claims Act and other statutes.

3.     During the Class Period, approximately 80% or more of Myriad's revenues came from its genetic tests of the BRCA1 and BRCA2 genes for mutations that are associated with increased risk of breast and ovarian cancer in women, and prostate cancer in men.  Myriad offers two such tests.  The first test, which Myriad calls "Comprehensive BRACAnalysis," sequences the BRCA1 and BRCA2 genes, and also tests for five recurring large rearrangements on the BRCA1 gene.   The second test, Myriad's "BART" test, detects other, rarer, large cancer-associated rearrangements on the BRCA1 and BRCA2 genes.

4.     Regulations require Myriad to bill government programs, like Medicare, using standardized billing codes, each of which has different reimbursement rates.   Myriad's Comprehensive BRACAnalysis test, when ordered alone, is assigned the code 81211, while the BART test when ordered alone is assigned the code 81213.   However, CMS guidelines make clear that the codes 81211 and 81213 cannot both be used when billing Medicare.   When a physician orders both the Comprehensive BRACAnalysis test and the BART test—as is usual practice for physicians—CMS guidelines require that Myriad use only one or the other of the two codes.

5.     In 2016, CMS introduced a third code, 81162, specifically to be used when both the Comprehensive BRACAnalysis test and the BART test are performed.   This new code also had a different reimbursement rate that was lower than the combined rate of the two tests if billed separately.   In introducing this new code, CMS again confirmed that the codes 81211 and 81213 cannot ordinarily both be used in billing.   In public statements, representatives of CMS

have made clear that using both the codes 81211 and 81213 when billing Medicare for services ordered together constitutes "fraudulent" "double billing."

6.      Nevertheless, during the Class Period, Defendants repeatedly billed Medicare for the Comprehensive BRACAnalysis test and the BART test using codes 81211 and 81213 even when these tests were ordered together (as they almost always were).

7.      At the same time, Defendants repeatedly told investors that the Company believed it was in full compliance with all applicable laws and regulations, including the False Claims Act.   In fact, Defendants clearly were aware that the Company was overbilling Medicare systematically for its most frequently ordered services.  Based on available figures, Myriad may have submitted over 30,000 false claims for reimbursement to Medicare alone.

8.      By misrepresenting its compliance with Medicare requirements, Defendants concealed from investors the massive risk the Company faced.  As a result of its noncompliance with government requirements, Myriad stands to be barred completely from participating in Medicare and other government programs and faces penalties up to $11,000 for each false claim it submitted to these programs—Myriad now faces exposure of well over $300,000,000 in penalties alone, as well as treble damages for the actual amounts by which the Company overbilled the government.

9.      Eventually, the Office of the Inspector General of the Department of Health and Human Services noticed Defendants' overbilling and launched an investigation into Myriad's billing practices.  On March 12, 2018, post-market, Myriad filed a disclosure on Form 8-K with the SEC, stating, in relevant part:

> The Company recently received a Subpoena from the Department of Health and Human Services, Office of Inspector General, in connection with an investigation into possible false or otherwise improper claims submitted for payment under Medicare and Medicaid. The Subpoena requested that the Company produce

documents relating primarily to the Company's billing to government-funded healthcare programs for the Company's hereditary cancer testing. The time period covered by the Subpoena is January 1, 2014 through the date of issuance of the Subpoena.

10.     On this news, Myriad's share price fell $4.01, or 12.14%, to close at $29.01 on March 13, 2018.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and § 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as Myriad's principal executive offices are located within this Judicial District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### III.   PARTIES

16.     Lead Plaintiffs Ethan Silverman and David K. Higgins, as set forth in their previously filed certifications, purchased Myriad securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Myriad is incorporated in Delaware, and the Company's principal executive offices are located at 320 Wakara Way, Salt Lake City, Utah 84108.   Myriad's securities trade on the NASDAQ under the ticker symbol "MYGN."

18.     Defendant Mark Christopher Capone ("Capone") has served as Myriad's Chief Executive Officer ("CEO") and President since July 2015.

19.     Defendant Peter D. Meldrum ("Meldrum") served as Myriad's CEO and President from November 1991 to June 2015.

20.     Defendant R. Bryan Riggsbee ("Riggsbee") has served as Myriad's Chief Financial Officer ("CFO") and Treasurer since June 2014 and as Myriad's Executive Vice President since October 2014.

21.     Defendant James S. Evans ("Evans") served as Myriad's CFO from November 2007 until October 2014.

22.     Defendants Capone, Meldrum, Riggsbee and Evans are sometimes referred to herein collectively as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority, and exercised such power and authority, to control the contents of Myriad's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with the Company, and their access to material

5

information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

24.    Myriad was founded in 1991 and is headquartered in Salt Lake City, Utah.  The Company develops and markets molecular diagnostic products to provide physicians with information to help guide the care of their patients, to prevent disease, delay the onset of disease, and catch disease at an early stage.  Myriad purports to employ a variety of proprietary techniques designed to provide an understanding of the genetic basis of disease and the role of genes in the onset, progression and treatment of disease.

25.    Myriad's stock trades on the NASDAQ Global Select ("NASDAQ") under the ticker symbol "MYGN."

### B.    Myriad's BRCA1 and BRCA2 Testing

26.    Discovered in the 1980s, BRCA1 is a gene on chromosome 17 that is involved in tumor suppression.  Female carriers of germline BRCA1 mutations have a lifetime risk of breast cancer exceeding 80 percent and of ovarian cancer approaching 60 percent.  BRCA2, another susceptibility gene for breast and ovarian cancer, is found on chromosome 13.  Carriers of BRCA2 mutations have a similar risk of breast cancer and a more moderately increased risk of ovarian cancer compared to those with BRCA1 mutations.  BRCA1 and BRCA2 mutations are also associated with an increase in prostate and colon cancers in men.

27.     In 1996, Myriad Labs began to offer clinical sequencing of the BRCA1 and BRCA2 genes in a test it called "BRACAnalysis."

28.     However, standard gene sequencing does not detect all mutations in the BRCA1 and BRCA2 genes.  In particular, unusual rearrangements in genes (such as large deletions or duplications) are not detected in a sequencing test.  Accordingly, in 2002, following improvements in genetic testing technology, a "rearrangement panel" in the BRCA1 and BRCA2 genes became available and became part of standard BRCA testing as part of the BRACAnalysis offering.  This 5-site rearrangement panel detects five recurring large rearrangements in BRCA1.

29.     In 2006, research of families at very high risk of hereditary breast and ovarian cancer detected additional rearrangements in BRCA1 and BRCA2.  In response to these findings, a new test to detect these rearrangements in the BRCA1 and BRCA2 genes was developed.

30.     This new technology, called BRACAnalysis® Rearrangement Test (BART), detects rare, large cancer-associated rearrangements of the DNA in the BRCA1 and BRCA2 genes that were previously undetected by the standard BRACAnalysis testing, which included only the 5-site rearrangement panel.

31.     In 2006, the lab began offering BRACAnalysis Large Rearrangement Test ("BART") as a standalone, full gene rearrangement test for both BRCA1 and BRCA2.  The cost was $700 for BART and for a period of time many insurers did not cover it.

32.     Since then, clinicians have ordered BART for selected higher risk cases, and BART has been performed automatically by the lab when a patient's personal and family history indicates particularly high risk.  Since January 2013, BART has been included in the vast

majority of all BRACAnalysis tests and BART is covered by most insurers.  The comprehensive

BRACAnalysis test, including BART, is now called "Integrated BRACAnalysis."[1]

33.     In 2015, 88% percent of the Company's revenue was derived from the sale of

products used to assess risk of hereditary cancer, including principally the Company's

BRACAnalysis and BART tests.  In 2014, 66% of the Company's revenue was derived from the

sale of the BRACAnalysis test and 11% from the sale of the BART test.

### C.     The HCPCS Coding System

34.     Established in 1978, the Healthcare Common Procedure Coding System

("HCPCS") provides a standardized coding system for describing the specific items and services

provided in healthcare.   HCPCS dictates the billing codes in the claims that physicians,

healthcare providers and suppliers, such as Myriad, submit to the Centers for Medicare and

Medicaid Services ("CMS").   Under 45 CFR § 162.100, Myriad is required to comply with the

regulations in Part 162 of Title 45, including 45 CFR § 162.1002(b)(1)-(c)(1), which specifies

that HCPCS, as maintained and distributed by the Department of Health and Human Services

(and by CMS, an agency within that Department), is the standard medical data code set for

"clinical laboratory tests" and "other medical diagnostic procedures," which includes Myriad's

genetic testing.   CMS maintains the codes in HCPCS in part through issuing guidance.

Accordingly, Myriad is legally required to use HCPCS and to follow CMS guidance on HCPCS

when using this coding in billing Medicare.

35.     The National Correct Coding Initiative ("NCCI") is a CMS program designed to

prevent improper payment of procedures.  The program provides billing entities such medical

---

[1] In September 2013, Myriad also launched its proprietary 25-gene myRisk Hereditary Cancer test ("myRisk"), which includes testing for multiple genes associated with cancer, including BRCA1 and BRCA2, both of which are associated with breast and ovarian cancer.

providers with a list (the "NCCI Correct Coding List") containing HCPCS code pairs that should not be reported together.

36.     As CMS has stated in its billing guidance documents, "Reporting the codes [designated not to reported together] separately is inappropriate.  Separate reporting would trigger a separate payment and would constitute double billing."

37.     Pursuant to NCCI, these code pairs fall into two categories:  (i) "modifier"—*i.e.*, those for which the appropriate use of a modifier allows the code pair to be reported together; and (ii) "no modifiers"—*i.e.*, those code pairs that should never be reported together, regardless of modifiers.

38.     One HCPCS modifier is -59, which is used to indicate that a code represents a service that is separate and distinct from another service with which it would usually be considered to be bundled.

39.     Because modifier -59 can be broadly applied to code pairs, CMS has issued guidance addressing its correct application.  CMS has frequently made clear that the -59 modifier should be used only rarely and is never to be used routinely.

40.     CMS has noted that the -59 modifier is routinely abused.  CMS has stated:

Some providers incorrectly consider [-59] to be the "modifier to use to bypass (NCCI)."  This modifier is associated with considerable abuse and high levels of manual audit activity; leading to reviews, appeals and even civil fraud and abuse cases.

The primary issue associated with the -59 modifier is that it is defined for use in a wide variety of circumstances, such as to identify:

- Different encounters;
- Different anatomic sites; and
- Distinct service.

The -59 modifier is

- Infrequently (and usually correctly) used to identify a separate encounter;
- Less commonly (and less correctly) used to define a separate anatomic site; and
- More commonly (and frequently incorrectly) used to define a distinct service.

The -59 modifier often overrides the edit in the exact circumstances for which CMS created it in the first place.  CMS believes that more precise coding options coupled with increased education and selective editing is needed to reduce the errors associated with this overpayment.

### D.    Coding of Myriad's Genetic Tests

41.    Myriad's BRCA1 and BRCA2 "Comprehensive BRACAnalysis" test, which includes a genetic sequencing test and a five-site rearrangement panel for five recurring large rearrangements in BRCA1, when ordered alone, is represented in HCPCS by the code 81211. Myriad's "BART" test, a full gene rearrangement test for both BRCA1 and BRCA2, is represented by code 81213.

42.    Beginning in April 2013, CMS included the pair 81211 and 81213 in the NCCI Correct Coding List, and stated as explanation for prohibiting the pair that the two codes specified "mutually exclusive procedures" for billing purposes.  Accordingly, a provider must override this pair prohibition by including a -59 modifier in order to bill for both services.

43.    In 2016, CMS introduced a third code applicable to BRCA1 and BRCA2 genetic testing, 81162, to be used where Myriad's "Integrated BRACAnalysis" test is ordered.  The Integrated BRACAnalysis test is simply Myriad's term for its Comprehensive BRACAnalysis test (81211) plus its BART test (81213).  Accordingly, beginning in 2016, providers were to use the HCPCS code 81162 where the tests represented by codes 81211 and 81213 were ordered together.

44.     Indeed, CMS has confirmed that codes 81211 and 81213 cannot be used together. In August 2015, Dr. Steve Phurrough of CMS unequivocally stated:

> If they [a lab] were to do both of these codes, then correct coding, non-fraudulent coding would be the new code 81162.  And to code both 81211 and 81213, when you did both of them, on the same patient, the same sample, would be incorrect coding.

### E.     Myriad Systematically Overbilled Medicare for Its Testing

45.     Between at least 2014 and 2016, Myriad repeatedly and systematically overbilled Medicare for the BRCA1 and BRCA2 genetic testing it performed.  Charts A, B and C below reflect data CMS has published about claims for payment submitted to CMS by Myriad and payments given by Medicare to Myriad in calendar years 2014, 2015 and 2016 respectively. Charts A and B demonstrate that in 2014 and 2015, the number of tests under code 81211 nearly equaled the number of tests conducted under code 81213.

46.     It is immensely improbable that the number of tests under code 81211 would nearly equal the number of tests conducted under code 81213 merely by random chance.  Rather, as confidential witnesses have confirmed (*see infra*) these tests were routinely ordered together—only rarely would a provider order Myriad's Comprehensive BRACAnalysis test under code 81211, but not order the companion BART test under code 81213.  As these tests were ordered separately only rarely, nearly all of the tests billed separately under codes 81211 and 81213 should have been billed together and not separately through use of the -59 modifier. These numbers also indicate that Myriad routinely billed Medicare for *both* tests, in violation of the NCCI Correct Coding List prohibition against billing using both codes.  If Myriad used the -59 modifier to override this prohibition, Myriad used this modifier routinely and systematically, in violation of CMS guidelines.

**Chart A:  2014 Medicare Payment Data**

| HCPCS Code | HCPCS Description | Number of Services | Number of Medicare Beneficiaries | Number of Distinct Medicare Beneficiary/ Per Day Services | Average Submitted Charge Amount | Average Medicare Payment Amount |
|---|---|---|---|---|---|---|
| 81211 | Gene analysis (breast cancer 1 and 2) full sequence and common duplication or deletion variants | 14,335 | 14,332 | 14334 | $3320.66 | $1944.44 |
| 81213 | Gene analysis (breast cancer 1 and 2) uncommon duplication or deletion variants | 14,113 | 14,106 | 14111 | $700 | $569.07 |

**Chart B:  2015 Medicare Payment Data**

| HCPCS Code | HCPCS Description | Number of Services | Number of Medicare Beneficiaries | Number of Distinct Medicare Beneficiary/ Per Day Services | Average Submitted Charge Amount | Average Medicare Payment Amount |
|---|---|---|---|---|---|---|
| 81211 | Gene analysis (breast cancer 1 and 2) full sequence and common duplication or deletion variants | 13726 | 13717 | 13726 | $3327.05 | $2123.61 |
| 81213 | Gene analysis (breast cancer 1 and 2) uncommon duplication or deletion variants | 13766 | 13758 | 13766 | $700 | $568.17 |

47.     Chart C below likewise indicates that the Company routinely overbilled Medicare for BRCA1 and BRCA2 genetic testing in 2016.  As in 2014 and 2015, Myriad appears routinely to have billed Medicare separately for tests conducted under codes 81211 and 81213.  As these tests were ordered separately only rarely, nearly all of the tests billed separately under codes 81211 and 81213 should have been billed together and not separately through use of the -59 modifier.  Moreover, Chart C indicates that the Company was aware that tests conducted under

codes 81211 and 81213 were to be billed using the code 81162, as Myriad billed more than half

of the BRCA1 and BRCA2 tests it performed using that code.

**Chart C:  2016 Medicare Payment Data**

| HCPCS Code | HCPCS Description | Number of Services | Number of Medicare Beneficiaries | Number of Distinct Medicare Beneficiary/ Per Day Services | Average Submitted Charge Amount | Average Medicare Payment Amount |
|---|---|---|---|---|---|---|
| 81211 | Gene analysis (breast cancer 1 and 2) full sequence and common duplication or deletion variants | 3,634 | 3,634 | 3,634 | 3,293.41 | 2,111.51 |
| 81213 | Gene analysis (breast cancer 1 and 2) uncommon duplication or deletion variants | 4,218 | 4,218 | 4,218 | 700 | 568.92 |
| 81162 | Gene analysis (breast cancer 1 and 2) full sequence and duplication or deletion variants | 8,637 | 8,637 | 8,637 | 4,040 | 2,435.82 |

48.    On information and belief, the Company continued to overbill Medicare during

the remainder of the Class Period as well.  However, Medicare has yet to make publicly available

its reimbursement data for periods beyond 2016.

49.    Confidential witnesses confirm that the Company's usual practice was to the

BRACAnalysis test under code 81211 and to bill the BART test separately under code 81213,

even though the two tests were routinely ordered together on the same patient and the same

samples.  CW1 was employed at Myriad Genetics from August 2006 to May 2015 in Salt Lake

City, Utah and worked as a Patient Advocate, *i.e.*, a customer service representative.  In this role,

CW1 worked to obtain billing authorization from private and government insurance, including

private insurance companies and Medicare and Medicaid, and personally used the billing codes

at issue, including 81211 and 81213.  The first confidential witness ("CW1") confirms that the

same billing codes and coding practices were used across the board for both private insurance companies and Medicare.  According to CW1, the codes for BRCA1 and BRCA1 testing were by far the most common, 81211 and 81213.  In fact, CW1 "didn't know any other codes."  CW1 and CW1's colleagues would routinely enter both 81211 and 81213 for BRACAnalysis and BART tests, and then a so-called "Reimbursement Specialist" in another department would override the block on using both codes by entering a -59 modifier.  As CW1 stated:

> "We were always 81211, 81213, and the reimbursement side would put in the Modifier 59.  The company gets more money.  This is the protocol we were told to follow."

50.     A second confidential witness ("CW2") stated that the BRACAnalysis and BART tests were routinely ordered together and that it was rare for only one test to be ordered without the other.  When both tests were ordered, the Company routinely billed separately for the two tests.  CW2 worked at Myriad as a Patient Advocate from March 2012 to October 2015 in Salt Lake City, Utah.  CW2's role as Patient Advocate was like that of CW1's.  CW2 stated that the circumstances under which only one test would be ordered individually were rare.

51.     A third confidential witness ("CW3") has stated that billing staff would use an override code, -59, to allow two codes to be billed separately.  CW3 worked for Myriad as a Patient Advocate in Salt Lake City, Utah from November 2007 to July 2015.  CW3's role as Patient Advocate was like that of CW1's.

52.     A fourth confidential witness ("CW4") also has confirmed that Myriad routinely billed using codes 81211 and 81213 separately, even for tests ordered at the same time for the same patient.  CW4 worked as a Reimbursement Specialist from December 2008 to December 2015.  A Reimbursement Specialist would input billing codes and processe billing of private insurance companies and Medicare and Medicaid.  According to CW4, Patient Advocates in customer service would first process an order for a test, and then Reimbursement Specialists

14

would ensure that the Company received reimbursement for the test from the payer.  CW4 stated that when attempts to bill 81211 and 81213 separately were not approved by the insurer or Medicare, CW4 would use the -59 modifier to override the block.  According to CW4, the same billing procedures were used for private insurance and for Medicare and Medicaid.

### F. Defendants Repeatedly Misled Investors by Failing To Disclose that the Company Systematically Had Overbilled Medicare and So Faced Massive Fines and Banning from Medicare

53.     In spite of repeatedly and systematically overbilling Medicare in ways that clearly violated CMS guidance, Defendants repeatedly assured investors that the Company was in compliance with all applicable laws and regulations.  For example, in its 2014, 2015, 2016 and 2017 Annual Reports to the SEC on Form 10-K, the Company outlined laws applicable to its billing practices, inducing the federal False Claims Act, and told investors straightforwardly: "We believe that we are in material compliance with all statutory and regulatory requirements . . . ."  Yet Defendants clearly failed to tell investors information that did not fairly align with that belief, namely, that Myriad was repeatedly and systematically overbilling Medicare for the Company's most commonly ordered products.  Defendants made additional false and misleading statements throughout the Class Period, as detailed below in Part V.

54.     Defendants misstatements and omissions were highly material to investors.  The Company faced severe penalties for violations of the False Claims Act, including payment of up to three times the actual damages sustained by the government, plus civil penalties of between $5,500 and $11,000 for each false claim, as well as exclusion from the federal health care programs.  Based on the information in Chart A, Defendants submitted as many as 14,113 false claims in 2014, 13,717 false claims in 2015, and 3,634 false claims in 2016 due to double-billing

Medicare under both codes 81211 and 81213.[2]   Accordingly, in making these false claims, Defendants created a risk of incurring civil penalties of at least between $173,052,000 and $346,104,000, without even factoring in treble the government's actual damages, including the actual amounts by which the government was overbilled.

55.     Moreover, as Defendants repeatedly violated the False Claims Act, the Company is now subject to being banned from participating as a Medicare provider.  As Defendant Capone publicly admitted in 2018, approximately 7% of the Company's revenue comes from Medicare payments.  As at least 15% of the Company's total revenue come from government programs and direct payments from patients, payments from other federal health care programs, including Medicaid, likely account for a significant additional amount of the Company's revenue.  Accordingly, these violations subjected the Company to long term loss of significant sources of revenue, amounting to between 7-15% of the Company's total revenue.

**G.     Upon Revelation of Defendants' Fraud, Myriad's Stock Price Dropped**

56.     On March 12, 2018, post-market, Myriad filed a disclosure on Form 8-K with the SEC, stating, in relevant part:

> The Company recently received a Subpoena from the Department of Health and Human Services, Office of Inspector General, in connection with an investigation into possible false or otherwise improper claims submitted for payment under Medicare and Medicaid.  The Subpoena requested that the Company produce documents relating primarily to the Company's billing to government-funded healthcare programs for the Company's hereditary cancer testing.  The time period covered by the Subpoena is January 1, 2014 through the date of issuance of the Subpoena.

57.     On this news, Myriad's share price fell $4.01, or 12.14%, to close at $29.01 on March 13, 2018.

---

[2] The Company may well have overbilled other government programs, including Medicaid, at similar rates. Myriad's payments from Medicaid are not publicly available.

58.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

59.     On May 7, 2014, Myriad filed its quarterly report with the SEC for the three months ending March 31, 2014 (the "May 7, 2014 10-Q"), in which the Company stated in part:

> This 17% increase in revenue is primarily due to increased molecular diagnostic testing volume for our Myriad myRisk Hereditary Cancer test, which we launched during 2013 as well as sales from VectraDA, our new test from the Crescendo subsidiary.

60.     The statements referenced in ¶ 59 were materially false and/or misleading because the statements failed to disclose that a source of the Company's revenue and financial success was its submission of duplicate claims to Medicare.

61.     On August 13, 2014, Myriad filed its Annual Report on Form 10-K for the fiscal year ended June 30, 2014, filed with the SEC on June 30, 2014 (the "2014 10-K").  In the 2014 10-K, Myriad stated:

> **Risks Related to Government Regulation**
>
> ***If we fail to comply with the complex federal, state, local and foreign laws and regulations that apply to our business, we could suffer severe consequences that could materially and adversely affect our operating results and financial condition.***
>
> Our operations are subject to extensive federal, state, local and foreign laws and regulations . . . .   These laws and regulations currently include, among other things:
>
> [. . .]
>
> - the federal False Claims Act, which imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment to the federal government;

[. . .]

We believe that we are in material compliance with all statutory and regulatory requirements, but there is a risk that one or more government agencies could take a contrary position . . . .

62.     Myriad made the same or substantially statements as those in ¶ 61 in its Annual Report on Form 10-K for the quarter and fiscal year ended June 30, 2015, filed with the SEC on August 12, 2015 (the "2015 10-K"), in its Annual Report on Form 10-K for the fiscal year ended June 30, 2016, filed with the SEC on August 10, 2016 (the "2016 10-K"), and in its Annual Report on Form 10-K for the fiscal year ended June 30, 2017, filed with the SEC on August 9, 2017 (the "2017 10-K").

63.     The statements referenced in ¶¶ 61-62 were materially false and/or misleading because:  (i) by stating "[i]f we fail to comply," the statement implies that the Company faced merely a risk of not complying with federal laws, when, in fact, the Company already had violated federal laws, including the False Claims Act; and (ii) the Company's professed belief that it was "in material compliance with all statutory and regulatory requirements" omitted the fact that the Company had repeatedly submitted duplicate claims, in violation of CMS regulations and federal laws like the False Claims Act.

64.     In the 2014 10-K, Myriad also stated:

*Federal and State Fraud and Abuse Laws*

A variety of federal laws prohibit fraud and abuse involving state and federal health care programs, such as Medicare and Medicaid. These laws are interpreted broadly and enforced aggressively by various state and federal agencies, including CMS, the Department of Justice, the Office of Inspector General for the Department of Health and Human Services ("OIG"), and various state agencies. [. . .]  Any overpayments [identified] must be repaid [to the Medicare program] unless a favorable decision is obtained on appeal.

[. . .]

18

*State and Federal Prohibitions on False Claims*

The federal False Claims Act imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment to the federal government. [. . .] Penalties include payment of up to three times the actual damages sustained by the government, plus civil penalties of between $5,500 and $11,000 for each false claim, as well as possible exclusion from the federal health care programs. In addition, various states have enacted similar laws modeled after the False Claims Act that apply to items and services reimbursed under Medicaid and other state health care programs, and, in several states, such laws apply to claims submitted to any payor.

65.     Myriad made the same statements as those in ¶ 64 in its 2015 10-K, its 2016 10-K, and its 2017 10-K.

66.     The statements referenced in ¶¶ 64-65 were materially false and/or misleading because the statements failed to tell the whole truth by omitting to state that the Company had repeatedly double billed Medicare for services, and so was not in compliance with, or was at acute risk of not being in compliance with, the federal and state prohibitions outlined in the statements.

67.     In the 2014 10-K, Myriad also stated:

*Failure to comply with government laws and regulations related to submission of claims for our services could result in significant monetary damages and penalties and exclusion from the Medicare and Medicaid programs and corresponding foreign reimbursement programs.*

We are subject to laws and regulations governing the submission of claims for payment for our services, such as those relating to: coverage of our services under Medicare, Medicaid and other state, federal and foreign health care programs; the amounts that we may bill for our services; and the party to which we must submit claims. Our failure to comply with applicable laws and regulations could result in our inability to receive payment for our services or in attempts by government healthcare programs, such as Medicare and Medicaid, to recover payments already made. Submission of claims in violation of these laws and regulations can result in recoupment of payments already received, substantial civil monetary penalties, and exclusion from government health care programs, and can subject us to liability under the federal False Claims Act and similar laws. The failure to report and return an overpayment to the Medicare or Medicaid program within 60

19

days of identifying its existence can give rise to liability under the False Claims Act. Further, a government agency could attempt to hold us liable for causing the improper submission of claims by another entity for services that we performed if we were found to have knowingly participated in the arrangement at issue.

68.     Myriad made the same statements as those in ¶ 67 in its 2015 10-K, its 2016 10-K, and its 2017 10-K.

69.     The statements referenced in ¶¶ 66-67 were materially false and/or misleading because the statements failed to tell the whole truth by omitting to state that the Company had repeatedly double billed Medicare for services, and so was not in compliance with, or was at acute risk of not being in compliance with, the federal and state prohibitions outlined in the statements.

70.     In the 2014 10-K, Myriad also stated:

Total revenue for the fiscal year ended June 30, 2014 was $778.2 million . . . . This 27% increase in revenue is primarily due to increased molecular diagnostic testing volume for all of our tests including the recently launched myRisk Hereditary Cancer test and the recently acquired VectraDA test.  [ . . .]   We believe that our increased sales, marketing, and education efforts resulted in wider acceptance of our molecular diagnostic tests by the medical community and increased patient testing volumes.

71.     The statements referenced in ¶ 70 were materially false and/or misleading because the statements failed to disclose that a source of the Company's revenue and financial success was its submission of duplicate claims to Medicare.

72.     Myriad's 2014 10-K, 2015 10-K, 2016 10-K and 2017 10-K contained signed certifications pursuant to SOX by Defendants Capone and Riggsbee, stating, in relevant part, that the each such filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

73.     The statements referenced in ¶ 72were materially false and/or misleading because Myriad's 2014 10-K, 2015 10-K, 2016 10-K and 2017 10-K filings each contained untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by each report.

74.     On May 5, 2015, on a conference call addressing the Company's Q3 2015 earnings, Defendant Capone stated:

> Total Hereditary Cancer revenue in the third quarter was $159 million, which was consistent with our expectations for the quarter. [. . .] Based upon our in-depth analysis of ordering physicians, we saw no discernible sequential market losses during the quarter.  Therefore, we believe that the Hereditary Cancer revenues this quarter reflect[] underlying market performance.

75.     The statements referenced in ¶ 74 were materially false and/or misleading because the statements failed to disclose that a source of the Company's revenue and financial success was its submission of duplicate claims to Medicare.

76.     On November 4, 2015, Myriad filed its quarterly report with the SEC for the three months ending September 30, 2015, in which the Company stated in part:

> The increase in revenue is primarily driven by growth in hereditary cancer testing revenues of $6.1 million and growth in pharmaceutical and clinical service revenues of $7.3 million.  The increase in hereditary cancer revenue was driven by increased volume associated primarily with our myRisk hereditary cancer panel test.

77.     The statements referenced in ¶ 76 were materially false and/or misleading because the statements failed to disclose that a source of the Company's revenue and financial success was its submission of duplicate claims to Medicare.

78.     On February 8, 2017, Myriad filed its quarterly report with the SEC for the three months ending December 31, 2016, in which the Company stated in part:

The increase in revenue was due to the inclusion of $21.7 million in GeneSight revenue resulting from the Assurex acquisition, $1.9 million increase in pharmaceutical and clinical services due to the timing of research projects with our pharmaceutical partners which can fluctuate from period to period. As well as increases in revenue of $1.2 million from Prolaris and $0.7 million from Endopredict.

79.    The statements referenced in ¶ 78 were materially false and/or misleading because the statements failed to disclose that a source of the Company's revenue and financial success was its submission of duplicate claims to Medicare.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

80.    Myriad, Capone, Meldrum, Riggsbee and Evans each knew that Myriad misstated key financial data during the Class Period, and each knew the false and misleading nature of the statements discussed above, or at a minimum was reckless for not knowing these matters.

81.    Defendants Capone and Meldrum served as CEO of Myriad during the Class Period.  As CEO, Capone and Meldrum were the head of Myriad's management and operations. Capone and Meldrum, by virtue of their responsibilities and activities as CEO, were privy to all material information concerning Myriad's key billing practices, including its double billing of Medicare.  As CEO, Capone and Meldrum would have received any material information about Myriad's key billing practices directly, or else immediately after any other employee at Myriad received that information.

82.    Likewise, Riggsbee and Evans, as CFO, were privy to all material information concerning Myriad's key billing practices, including its double billing of Medicare, and would have received any material information about Myriad's key billing practices directly, or else immediately after any other employee at Myriad received that information.

83.    Defendants frequently made clear that they were familiar with Medicare billing and coding practices on conference calls with investors.  On Myriad's November 3, 2015

22

earnings calls with investors, Defendant Capone stated, "I would like to address the recent Medicare pricing comments for the new Vectra DA CPT code. [. . .] [Myriad's test] Vectra DA was included in this group of tests, with a crosswalk that represents approximately a 60% decrease in pricing."

84.     Likewise, on Myriad's February 7, 2017 earnings call with investors, Defendant Capone responded to a question about "CPT coding" by stating:

> [T]here is obviously a CPT coding committee coming up, a couple of different codes are under discussion.  I think the one that probably has got the most discussion is a code 81432, which is the sequencing code that some companies are using.  The codes that we use are all things that we negotiate and include in all of our private payer contracts, and have discussions with Medicare as well.  81432 is not a code we use, it's not in our contract.

85.     Similarly, on Myriad's August 8, 2017 earnings call with investors, Defendant Capone discussed resubmission of claims to Medicare for a particular test (Vectra DA) and noted, "We're still in discussions with Medicare about what a revised LCD might look like for Vectra DA."  On the same call, Defendant Riggsbee responded to questions regarding whether the Protecting Access to Medicare Act of 2014 ("PAMA") would "bump up BRCA payments" from Medicare, and Defendant Riggsbee replied "what we would expect is that PAMA would not negatively impact our rates."

86.     The core of Myriad's business is the selling of BRCA1 and BRCA2 genetic testing.   Accordingly, Myriad and the Individual Defendants were privy to all material information concerning Myriad's selling of this testing, including material information about the sales of these services (and critical associated billing practices) to Medicare.

87.     Statements by confidential witnesses confirm that Defendants acted with scienter. CW1 also has stated that changes to billing procedures were conveyed in "big meetings in our auditorium" by the customer service leadership, including the President of Customer Service.

23

Defendant Capone sometimes would personally attend these meetings. CW3 likewise stated that directives and instructions for customer service representatives were given at customer service department meetings, and that CEO Mark Capone sometimes attended these meetings.

88.     A fifth confidential witness ("CW5") has stated that directives regarding billing were relayed in the first instance by Senior Director of Customer Service Amy Deffenbaugh, who reported to President Alex Ford, and took direction on billing matters from Alex Ford and Defendant Capone. CW5 worked at Myriad from May 2003 to May 2017 as a customer service manager, then a customer service supervisor, and then a trainer for customer service. CW5 stated that Deffenbaugh "would come down from her meetings with Alex Ford and Mark Capone and would tell [Patient Advocate Supervisors] what the rules were." CW5 stated that billing practices were explained in training classes, in binders of printed materials, and on the Company's intranet.

89.     A sixth confidential witness ("CW6") also has stated that the Director of Customer Service Amy Deffenbaugh gave Patient Advocates their directives in the first instance, and that Deffenbaugh often met with senior managers. CW6 worked at Myriad as a Patient Advocate from April 2015 to July 2016.

90.     CW1 and CW4 have both confirmed that the coding and coding practices for private insurance and government healthcare programs were the same. CW5 has likewise stated that the same billing procedures were used for all payers, including private insurance and Medicare and Medicaid, and that the underlying codes used by all payers came from Medicare and Medicaid. Accordingly, Myriad's double billing practice was companywide, and affected all billing for hereditary cancer testing, which amounted to 88% of the Company's total revenue in 2015.

## VII.    CLASS ACTION ALLEGATIONS

91.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Myriad securities traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

92.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Myriad securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Myriad or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

93.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

94.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

95.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Myriad;

- whether Defendants caused Myriad to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Myriad securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

96.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

97.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Myriad securities are traded in efficient markets;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and

- Plaintiffs and members of the Class purchased and/or sold Myriad common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

98. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

99. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VIII.   COUNT ONE

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

100. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

101. During the Class Period, Defendants made, disseminated or approved the false and misleading statements specified above.  Defendants knew that such statements, when made, were false and misleading, or were reckless in their disregard as to the truth of such statements,

which contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.   Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)   employed devices, schemes, and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and other members of the Class in connection with their acquisitions of Myriad securities during the Class Period.

103.   Plaintiffs and other members of the Class have suffered damages in that, in reliance on the Defendants' statements and the integrity of the market, they paid artificially inflated prices for Myriad's securities.  Plaintiffs and other members of the Class would not have purchased such securities at the prices they paid, or at all, if they had been aware that the market prices of such securities had been artificially and falsely inflated by Defendants' misleading statements.

104.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Myriad's securities during the Class Period.

## IX.   COUNT TWO

### Violation of Section 20(a) of the Exchange Act Against
### the Individual Defendants

105.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

106.   During the Class Period, the Individual Defendants participated in the operation and management of Myriad, and conducted and participated, directly and indirectly, in the conduct of Myriad's business affairs.  Because of their senior positions, they knew the adverse non-public information about Myriad's misstatement of income and expenses and false financial statements.

107.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Myriad's financial condition and results of operations, and to correct promptly any public statements issued by Myriad that had become materially false or misleading.

108.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Myriad disseminated in the marketplace during the Class Period concerning Myriad's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Myriad to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Myriad within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Myriad securities.

109.     Each of the Individual Defendants, therefore, acted as a controlling person of Myriad.  By reason of their senior management positions and/or being directors of Myriad, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Myriad to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Myriad and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

110.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Myriad.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.     Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Appointing Plaintiffs as representative for the Class and their counsel as class counsel for the Class;

C.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Such other and further relief as the Court may deem just and proper.

## XI.     JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury in this action.

Dated:  August 31, 2018                    Respectfully submitted,

                                           POMERANTZ LLP

                                           */s/ Austin P. Van*
                                           Austin P. Van
                                           (admitted *pro hac vice*)
                                           Jeremy A. Lieberman
                                           600 Third Avenue, 20th Floor
                                           New York, New York 10016
                                           Telephone:  (212) 661-1100
                                           Facsimile:  (212) 661-8665
                                           Email:  avan@pomlaw.com
                                                    jalieberman@pomlaw.com

                                           GLANCY PRONGAY & MURRAY LLP
                                           Robert V. Prongay
                                           Ex Kano S. Sams II
                                           1925 Century Park East, Suite 2100
                                           Los Angeles, California 90067
                                           Telephone: (310) 201-9150
                                           Facsimile: (310) 201-9160
                                           Email: rprongay@glancylaw.com
                                                    esams@glancylaw.com

                                           ***Attorneys for Lead Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on August 31, 2018, which caused an electronic copy of this document to be served on all counsel of record in this matter.

/s/ Austin P. Van
Austin P. Van