**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **MATTHEW KESSMAN, Individually and on Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**MYRIAD GENETICS, INC., MARK CHRISTOPHER CAPONE, PETER D. MELDRUM, R. BRYAN RIGGSBEE, and JAMES S. EVANS,**<br><br>**Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No. 2:18-CV-00336-DAK**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on Defendants Myriad Genetics, Inc., Mark Christopher Capone, Peter D. Meldrum, R. Bryan Riggsbee, and James S. Evans' Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The court held a hearing on the motion on March 8, 2019. At the hearing, Plaintiffs were represented by Austin P. Van, and Defendants were represented by Erik A. Christiansen. The court took the matter under advisement. The court considered carefully the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motion. Now being fully advised, the court issues the following Memorandum Decision and Order.

## BACKGROUND

### I.       Myriad's Genetic Testing

Founded in 1991 and headquartered in Salt Lake City, Utah, Myriad Genetics, Inc. ("Myriad") develops and markets molecular diagnostic products to provide physicians with

information to guide the care of their patients as well as prevent, detect, or delay disease. Myriad's stock trades on the NASDAQ Global Select ("NASDAQ") under the ticker symbol "MYGN." Peter D. Meldrum ("Meldrum") was Myriad's CEO and President from November 1991 to June 2015. Mark Christopher Capone ("Capone") has served as Myriad's CEO and President since July 2015. James S. Evans ("Evans") was Myriad's CFO from November 2007 to October 2014. R. Bryan Riggsbee ("Riggsbee") has served as Myriad's CFO and Treasurer since June 2014 and as an Executive Vice President since October 2014.

 Important to Myriad's growth and success is its research and discoveries regarding cancer-related genes. BRCA1, a gene located on chromosome 17, and BRCA2, a gene located on chromosome 13, are both tumor suppressor genes. Women with mutations of either gene have an increased risk of contracting breast and ovarian cancer. BRCA1 and BRCA2 mutations are also associated with an increase in prostate and colon cancers in men. Broadly speaking, mutations of these genes come in two types: (1) sequence and (2) large rearrangement—also known as duplication/deletion. Sequence mutations are small changes in the DNA sequence of a gene, while large rearrangement mutations are duplications, deletions, insertions, or inversions of large chunks of DNA.

In 1996, Myriad began offering a diagnostic test called "BRACAnalysis," which was designed to detect sequence mutations in BRCA1 and BRCA2. A few years later, Myriad added a second testing component that could detect five recurring large arrangements in BRCA1, and Myriad renamed the test "Comprehensive BRACAnalysis." In 2006, Myriad developed another test—the BRACAnalysis Rearrangement Test—that could detect large cancer-associated rearrangements in the BRCA1 and BRCA2 genes that were previously undetected by the standard BRACAnalysis testing. That same year, Myriad began offering BRACAnalysis Large

Arrangement Test ("BART") as a standalone, full gene rearrangement test for both genes. The Comprehensive BRACAnalysis test, including BART, is now called "Integrated BRACAnalysis." Myriad derives a significant portion of its yearly revenue from its BRACAnalysis and BART tests, and providers generally order both tests together.

## II.      Billing Practices for Myriad's Genetic Testing

Physicians, healthcare providers, and medical suppliers, such as Myriad, are subject to the Healthcare Common Procedure Coding System ("HCPCS"). This system provides a standardized coding system for describing the specific items and services provided in healthcare, and it applies to clinical laboratory tests and other medical diagnostic procedures, including Myriad's genetic testing. The HCPCS dictates which billing codes physicians, healthcare providers, and suppliers should use when submitting claims to the Centers for Medicare and Medicaid Services ("CMS"), an agency within the Department of Health and Human Services ("HHS"). In order to prevent improper payment procedures, CMS developed a program called the National Correct Coding Initiative ("NCCI"). The program provides billing entities such as medical providers with a list (the "NCCI Correct Coding List") that contains HCPCS code pairs that should not be reported together. For code pairs that generally should not be reported together, a provider can utilize certain modifiers to override the prohibited pair. The "-59" modifier is used in a variety of circumstances including when a code represents a service that is separate and distinct from another service with which it would usually be bundled. Additionally, it can be used to override code pair prohibitions. CMS has noted that the -59 modifier is commonly misused.

In 2011, CMS developed almost 100 new codes to describe the molecular pathology procedures used to test various genes, two of which were BRCA1 and BRCA2. Two of

Myriad's BRCA1 and BRCA2 genetic tests were given codes. Myriad's Comprehensive

BRACAnalysis test is represented by the code 81211, and Myriad's BART test is represented by

the code 81213. In April 2013, CMS included the pair 81211 and 81213 on the NCCI Correct

Coding List because the two codes represented "mutually exclusive procedures" for billing

purposes. Accordingly, a provider was to bill under billing codes 81211 and 81213 only when

one or the other was performed, but when both tests were performed, they were to be billed

together under the single code 81211. Nevertheless, if providers billed using both codes, they

would need to include a -59 modifier to override the pair prohibition and bill for both services.

In 2016, CMS implemented a third code, 81162, which providers were to use when Myriad's

Integrated BRACAnalysis test—the test that includes the Comprehensive BRACAnalysis test

(81211) plus the BART test (81213)—was ordered. Thus, beginning in 2016, providers were to

use code 81162 where the tests represented by codes 81211 and 81213 were ordered together

instead of 81211 and 81213 individually.

### III.    Plaintiffs' Allegations

Matthew Kessman ("Kessman") filed the instant suit on April 20, 2018 alleging

violations of  (1) § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) (the

"Exchange Act") and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) against all Defendants; and (2) §

20(a) of the Exchange Act (15 U.S.C. § 78t) against Capone, Meldrum, Riggsbee, and Evans

(collectively, the "Individual Defendants"). On June 25, 2018, this court designated Ethan

Silverman ("Silverman") and David K. Higgins ("Higgins") as Lead Plaintiffs. Plaintiffs

subsequently filed an Amended Complaint on August 31, 2018.

In the Amended Complaint, Plaintiffs allege that Myriad and the Individual Defendants

systematically overbilled Medicare for the BRCA1 and BRCA2 testing that Myriad performed.

Plaintiffs claim that Myriad knowingly violated CMS's billing guidelines by billing 81211 and 81213 individually when a provider performed both tests instead of billing for both tests collectively under the single code 81211.  Plaintiffs assert Myriad utilized the -59 modifier to override the prohibition on billing 81211 and 81213 together.  Further, Plaintiffs claim that after CMS implemented the 81162 code in 2016, Myriad continued billing using the individual codes 81211 and 81213 instead of using 81162 to bill in situations when providers performed both tests.  Relying on the testimony of six confidential witnesses formerly employed by Myriad, Plaintiffs assert that it was Myriad's standard practice to improperly use the -59 modifier and double bill Medicare in conjunction with tests billed under codes 81211, 81213, and 81162.  In addition, Plaintiffs allege that the Individual Defendants had knowledge of Myriad's actions and each constituted a controlling person thereby incurring personal liability for Myriad's actions.

Finally, on March 12, 2018, Myriad filed a disclosure on Form 8-K with the SEC, which stated in relevant part:

> The company recently received a Subpoena from the Department of Health and Human Services, Office of Inspector General, in connection with an investigation into possible false or otherwise improper claims submitted for payment under Medicare and Medicaid.  The Subpoena requested that the Company produce documents relating primarily to the Company's billing to government-funded healthcare programs for the Company's hereditary cancer testing.  The time period covered by the Subpoena is January 1, 2014 through the date of issuance of the Subpoena.

On this news, Myriad's share price fell $4.01, or 12.14%, to close at $29.01 on March 13, 2018. Plaintiffs claim that the subpoena and investigation and the corresponding drop in Myriad stock prices were the materialization of the risk posed by Myriad's alleged unlawful double billing practice.  Thus, between May 7, 2014 and March 12, 2018 (the "Class Period"), Plaintiffs claim that Myriad misled investors into paying artificially inflated prices for Myriad's securities, which they would not have paid had they been aware of Myriad's alleged wrongful conduct.

**DISCUSSION**

Defendants move to dismiss Plaintiffs' Amended Complaint for failure to state a claim. Generally, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must . . . accept all factual allegations in the complaint as true, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "all well-pleaded factual allegations in the . . . complaint are . . . viewed in the light most favorable to the nonmoving party," *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1187 (10th Cir. 2003). Further, "courts must consider the complaint in its entirety," including "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322.

Notwithstanding the general pleading standard established by *Twombly* and *Iqbal*, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes heightened pleading requirements for § 10(b) plaintiffs. *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). The PSLRA's heightened standard "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." *Tellabs,* 551 U.S. at 313. Consequently, § 10(b) plaintiffs "bear[] a heavy burden at the pleading stage." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1201 (10th Cir. 2015) (quoting *Weinstein v. McClendon*, 757 F.3d 1110, 1112 (10th Cir. 2014)).

**I.      Plaintiffs' § 10(b) and SEC Rule 10b-5 Claim**

Under §10(b), it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such

rules and regulations as the Commission may prescribe . . . for the protection of investors." 15

U.S.C. § 78j(b). In conjunction with § 10(b), SEC Rule 10b–5 prohibits "mak[ing] any untrue

statement of a material fact." 17 C.F.R. § 240.10b–5. Moreover, to state a claim for securities

fraud under § 10(b), plaintiffs must adequately allege that:

> (1) the defendant made an untrue or misleading statement of material fact, or failed
> to state a material fact necessary to make statements not misleading; (2) the
> statement complained of was made in connection with the purchase or sale of
> securities; (3) the defendant acted with scienter, that is, with intent to defraud or
> recklessness; (4) the plaintiff relied on the misleading statements; and (5) the
> plaintiff suffered damages as a result of his [or her] reliance.

*In re Level 3*, 667 F.3d at 1333 (quoting *Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1095

(10th Cir. 2003)). Myriad moves to dismiss Plaintiffs' Amended Complaint for failing to

properly allege the first (material misleading statements or omissions), third (scienter), and fifth

(loss causation) elements. To survive Myriad's motion, Plaintiffs must have met the PSLRA's

heightened pleading requirements for the first and third elements. *See Tellabs,* 551 U.S. at 313.

### A. Material Misleading Statements and Omissions

To adequately allege the first element of a claim for securities fraud under § 10(b), a

"complaint shall specify each statement alleged to have been misleading, the reason or reasons

why the statement is misleading, and, if an allegation regarding the statement or omission is

made on information and belief, the complaint shall state with particularity all facts on which

that belief is formed." § 78u–4(b)(1)(B).

In the Amended Complaint, Plaintiffs allege that Myriad made various false statements or

omitted material information related to Myriad's billing practices. Plaintiffs' allegations fall into

two categories. First, Defendants made false statements in Myriad's Annual Reports when they

expressed their belief that Myriad was in material compliance with federal law. For example,

Myriad's 2014 10-K stated:

> If we fail to comply with the complex federal, state, local and foreign laws and regulations that apply to our business, we could suffer severe consequences that could materially and adversely affect our operating results and financial condition.
>
> Our operations are subject to extensive federal, state, local and foreign laws and regulations . . . . These laws and regulations currently include, among other things:
>
> [. . .]
>
> [T]he federal False Claims Act, which imposes liability on any person or entity that . . . causes to be presented a false or fraudulent claim for payment to the federal government;
>
> [. . .]
>
> We believe that we are in material compliance with all statutory and regulatory requirements, but there is a risk that one or more government agencies could take a contrary position . . . .

Myriad's 2014 10-K further stated that federal laws prohibiting fraud and abuse involving state and federal health care programs are interpreted broadly and enforced aggressively; that violations of the False Claims Act could result in civil penalties between $5,500 and $11,000 for each false claim; and that failure to comply with relevant laws and regulations could result in the company's exclusion from the Medicare and Medicare programs. In addition, pursuant to the Sarbanes-Oxley Act ("SOX"), Myriad's 2014 10-K contained signed certifications by Capone and Riggsbee stating that the filing did not contain any untrue statement of a material fact or material omission of fact. Myriad made the same or substantially the same statements in its 2015, 2016, and 2017 10-Ks. Plaintiffs claim that such statements and representations were materially false or misleading because Myriad was already violating federal laws and regulations by double billing Medicare. Likewise, Plaintiffs argue that Myriad's failure to disclose its illegal billing practices was highly material to investors as Myriad's actions put the company at severe risk of monetary penalties and expulsion from government programs.

Second, Defendants made various statements regarding Myriad's financial situation and increase in company revenue. For example, in Myriad's quarterly report that it filed with the SEC on November 4, 2015, Myriad stated in part:

> The increase in revenue is primarily driven by growth in hereditary cancer testing revenues of $6.1 million and growth in pharmaceutical and clinical service revenues of $7.3 million. The increase in hereditary cancer revenue was driven by increased volume associated primarily with our myRisk hereditary cancer panel testing.

Myriad made comparable statements addressing similar issues in its 2014 10-K; on a May 5, 2015 conference call addressing Myriad's earnings; and in a quarterly report Myriad file with the SEC on February 8, 2017. These statements, Plaintiffs allege, were false because the true reason for Myriad's financial success was its submission of duplicate claims to Medicare.

Each of the alleged false or misleading statements and omissions rely upon one critical assumption—that Myriad's billing practices were indeed illegal. Consequently, to survive Myriad's motion, Plaintiffs were required to plead sufficient facts not only establishing that Myriad's statements were false, but also that Myriad's billing practices were illegal. Myriad cannot incur liability for false statements regarding its billing practices unless its billing practices prove to be fraudulent. Plaintiffs have failed to meet this requirement.

Plaintiffs claim that before 2016, Defendants violated CMS guidelines by routinely using the -59 modifier to override the billing pair prohibition on 81211 and 81213. Further, Plaintiffs claim that when Myriad performed both tests represented by 81211 and 81213 together, they were to be billed under the single code 81211. The court finds these allegations insufficient for two reasons. First, CMS guidelines noted that the tests represented by 81211 and 81213 were "separate and distinct," and thus their pair prohibition could be overridden by the -59 modifier.

Indeed, the NCCI Correct Coding List designated the code pair 81211 and 81213 with a "1" meaning that a modifier could be used with that pair.

Second, billing for both 81211 and 81213 using the -59 modifier appears to have been an acceptable practice within the industry. The Defendants provided publicly-available data for other companies who billed virtually the same number of tests under 81211 as they did under 81213—the same practice as Myriad. If this practice was undeniably contrary to CMS guidelines, it seems highly improbable that CMS would either allow or be entirely unaware of more than 30,000 fraudulent claims over a three-year period (2014-2016) without taking steps to curb the issue. Yet, Plaintiffs have pointed to no instance in which CMS denounced or criticized Myriad's billing practices generally. Likewise, Plaintiffs have failed to point to any agency action or statement establishing that Myriad's 81211 and 81213 billing practices were improper. Without any such statements, Plaintiffs' suit is premature. Moreover, given the complexity of the Medicare billing framework, CMS is far better situated to evaluate Myriad's billing practices than is the court. *See Heckler v. Chaney*, 470 U.S. 821, 831–33 (1985) (explaining that an "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities").

Plaintiffs also claim that Defendants violated CMS billing guidelines by continuing to bill both 81211 and 81213 instead of 81162 after January 1, 2016. Plaintiffs rely on CMS guidelines that state that after January 1, 2016, the code 81162 should replace codes 81211 and 81213 when providers perform both tests. In addition, Plaintiffs point to a comment made by Dr. Steve Phurrough, a former CMS Medical Officer, during a meeting of the Advisory Panel on Clinical Diagnostic Laboratory Tests (CDLT) in August 2015. Dr. Phurrough opined, "If they [a lab] were to do both of these codes [81211 and 81213], then correct coding, non-fraudulent coding

would be the new code 81162. And to code both 81211 and 81213, when you did both of them, on the same patient, the same sample, would be incorrect coding."

By April 2016, Defendants had made the transition over to using 81162. The Amended Complaint fails to adequately allege that anything other than an immediate transition was unlawful, and Plaintiffs point to no CMS statement prohibiting the time Myriad took to transition. Again, the court will defer to CMS's enforcement discretion on this matter. *See Heckler*, 470 U.S. at 832 (explaining that an agency's decision not to take enforcement action "has traditionally been 'committed to agency discretion'"). Furthermore, while Plaintiffs point to Dr. Phurrough's statement as evidence of CMS's position, that statement says nothing about timing or transition. It simply affirmed that providers were to bill code 81162 when they performed the exams represented by 81211 and 81213 together.

Plaintiffs have failed to allege with particularity that Myriad made untrue statements or omissions of material fact necessary for their § 10(b) securities fraud claim to survive. Accordingly, the court grants Myriad's motion to dismiss Plaintiffs' § 10(b) claim.

### B. Scienter

If the court were to assume, *arguendo*, that Plaintiffs had adequately pled the first element of their § 10(b) claim, Plaintiffs' claims would nevertheless fall short under the element of scienter. To adequately allege scienter, a "complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." § 78u–4(b)(2)(A) (emphasis added). The required state of mind for § 10(b) claims is "a mental state embracing intent to deceive, manipulate, or defraud, or recklessness." *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1236–37 (10th Cir. 2016). In this context, recklessness "is a high bar." *In re Zagg*,

797 F.3d at 1201. Courts have defined it "as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*

For an inference of scienter to qualify as strong, it "must be more than reasonable or permissible—it must be cogent and compelling." *Anderson*, 827 F.3d at 1237 (quoting *Tellabs*, 551 U.S. at 314) (internal quotation marks omitted). Furthermore, the scienter inquiry is "inherently comparative." *Tellabs*, 551 U.S. at 323. When assessing the strength of an inference of scienter, courts must compare the "inferences urged by the plaintiff[s]" with "competing inferences rationally drawn from the facts alleged." *Id.* at 314. A complaint will suffice "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Accordingly, "to determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct." *Id.* at 323–24.

In the Amended Complaint, Plaintiffs allege that the Individual Defendants had knowledge of Myriad's false statements or were at least reckless regarding the statements and their misleading nature. Plaintiffs aver that during their respective times serving as CEO, Capone and Meldrum were privy to all material information concerning Myriad's key billing practices, including Myriad's double billing practice, by virtue of their company responsibilities and activities. As CEO, Plaintiffs allege Capone and Meldrum would have received material information about Myriad's key billing practices directly or immediately after any other Myriad employee. Likewise, Plaintiffs claim that Riggsbee and Evans, as CFO, were privy to all material information concerning Myriad's key billing practices and would have received any

12

material billing information directly or immediately after any other employee.  Additionally, because the core of Myriad's business is selling BRCA1 and BRCA2 genetic testing, Plaintiffs aver that Defendants were privy to all material information related to that core operation.

Plaintiffs also allege that the Individual Defendants made clear that they were familiar with billing and coding practices on conference calls with investors.  As evidence, Plaintiffs point to three earnings calls with investors in which Capone and Riggsbee discussed specific billing and coding issues.  Lastly, Plaintiffs assert that statements made by confidential witnesses confirm that Defendants acted with scienter.  The confidential witnesses claimed that (1) billing procedures were conveyed in big meetings by customer service leadership, and Capone would sometimes personally attend those meetings; (2) directives and instructions for customer service representatives were given at customer service department meetings, and Capone would occasionally attend those meetings; (3) billing directives were conveyed to employees from the Senior Director of Customer Service, Amy Deffenbaugh ("Deffenbaugh"), who frequently had meetings with Capone; (4) Deffenbaugh took billing directions from Capone; and (5) Deffenbaugh frequently met with other senior managers.  Plaintiffs further claim that billing practices were taught in training classes, in printed materials, and on Myriad's intranet.

While Plaintiffs' Amended Complaint alleges sufficient factual material to establish that Capone and Riggsbee had knowledge of Myriad's billing practices, the complaint falls short of stating with particularity facts giving rise to a strong inference that the Defendants knew that Myriad's billing practices were fraudulent.  Similarly, the Amended Complaint fails to meet the "high bar" required to adequately allege that Defendants acted recklessly.  *In re Zagg*, 797 F.3d at 1201.

First, after comparing competing inferences drawn from the alleged facts, the court finds that Plaintiffs' urged inference of a multi-year fraudulent billing scheme is neither cogent nor compelling. The court finds an opposing inference to be stronger and more compelling—that Defendants believed, or had no reason to doubt, that their billing practices were proper. Over the course of the Class Period, Defendants submitted thousands upon thousands of claims over multiple years. During that time period, neither CMS nor any other agency notified Myriad to establish its billing practices were improper. Indeed, to date, no agency has criticized or condemned Myriad for its billing practices during the Class Period.[1] Likewise, nothing in CMS guidelines specifically prohibited Myriad's use of the -59 modifier. Thus, it was reasonable for Myriad to assume that its billing practices were proper. This inference is made even more compelling by the fact that multiple other companies within the industry were billing in the same manner.

Next, nearly all of Plaintiffs' scienter allegations are based on the Individual Defendants' company positions. Scienter, however, cannot be inferred "based only on a defendant's position in a company or involvement with a particular project." *Anderson*, 827 F.3d at 1245; *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1264 (10th Cir. 2001). "Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' *actual exposure to information*, it will usually fall short of the [securities laws' pleading] standard." *Id.* at 1245–46 (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)) (emphasis added). In this case, the Amended Complaint is devoid of any detailed allegations of the Individual Defendants' actual

---

[1] Plaintiffs' core-operations argument fails for similar reasons. Even if Defendants were privy to all material billing information related to their core operations, Plaintiffs have failed to allege that the billing practices for Myriad's core operations were fraudulent. Thus, Plaintiffs' core-operations argument does not support a strong inference of scienter.

exposure to information related to Myriad's purported billing scheme.  First, it fails to make any specific allegations related to either Meldrum or Evans and alleges scienter based on nothing more than their company positions; Plaintiffs make similar position-based allegations against Capone and Riggsbee.  Such allegations, however, are insufficient as a matter of law.  Second, while Plaintiffs do adequately allege that Capone and Riggsbee were knowledgeable of Myriad's general billing practices, they fail to establish that Capone and Riggsbee knew that any such billing practices were improper, let alone fraudulent.

Further, the confidential witnesses' statements are insufficient to create a strong inference of scienter.  The confidential witnesses in this case were all lower-level employees.  As such, they were simply "too far removed from the [company] executives and did not provide sufficiently particularized accounts of what the [company] executives must have known." *Anderson*, 827 F.3d at 1244; *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009) ("[G]eneralized claims about corporate knowledge are not sufficient to create a strong inference of scienter, since they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state.").  Moreover, the confidential witnesses failed to "provide evidence bearing on the executives' mental states." *Anderson*, 827 F.3d at 1244.

Plaintiffs also claim that the Individual Defendants had the required scienter because they attended meetings in which billing procedures were discussed.  Such allegations, however, do not meet the high standard required to establish a strong inference of scienter.  *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1122 (10th Cir. 2014) ("[N]othing in the defendants' routine attendance at . . . meetings serves to suggest a 'cogent' and 'compelling' inference of scienter."); *In re Level 3*, 667 F.3d at 1344 (concluding

that even though the defendants "monitored [a program] through regular meetings and reports," it did not establish a strong inference of scienter).

Finally, Plaintiffs fail to offer anything in the way of motive. "Although the absence of an apparent motive does not necessarily defeat a finding of scienter, it does make such a finding more difficult to sustain." *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1173 (10th Cir. 2018); *In re Level 3*, 667 F.3d at 1347.

Therefore, Plaintiffs have failed to allege facts giving rise to a strong inference of scienter and thus have failed to state a claim for securities fraud under § 10(b).

## C. Loss Causation

Even if the court were to assume that Plaintiffs had met the heightened pleading standard for the first and third elements of their claim, Plaintiffs' Amended Complaint would still fail under loss causation. "Loss causation . . . is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1136 (10th Cir. 2009) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). At the outset, the parties disagree as to which pleading standard courts apply to loss causation allegations—Rule 8(a) or Rule 9(b). *Compare Alaska Elec. Pension Fund v. Asar*, 898 F.3d 648, 665 n.79 (5th Cir. 2018), *and Better v. YRC Worldwide Inc.*, No. CIV.A.11-2072-KHV, 2012 WL 4433500, at *10 (D. Kan. Sept. 25, 2012) (applying 8(a)), *with Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011), *and Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014) (applying 9(b)). The Tenth Circuit has not taken a position on this matter. In any event, the court finds Plaintiffs' Amended Complaint insufficient under both standards, and therefore need not address the question of which standard should apply.

To plead loss causation, plaintiffs must show that their "losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." *In re Williams*, 558 F.3d at 1137; *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (requiring a plaintiff to show that it was the revelation of fraud that caused the loss and not one of the "tangle of factors" that affect price). "The securities laws are not meant to 'provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'" *In re Williams*, 558 F.3d at 1137 (quoting *Dura*, 544 U.S. at 345).

Loss causation can be shown through (1) "a corrective disclosure" which "reveals the fraud to the public"; (2) a "leakage theory" in which "the relevant truth . . . leak[s] out" bit by bit, *id.* at 1137–38; or (3) "a theory of materialization of a concealed risk" in which "a plaintiff . . . show[s] that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized," *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1154 (10th Cir. 2015). Under a theory of the materialization of a concealed risk, plaintiffs must allege that (1) the "risk that materialized was within the zone of risk concealed by the misrepresentation (foreseeability); and (2) the "materialization of the risk caused a negative impact on the value of the securities (causal link)." *Id.* "Regardless of which method the [plaintiffs] employ[], they must establish 'how [and when] the truth was revealed.'" *In re SandRidge Energy, Inc. Sec. Litig.*, No. CIV-12-1341-W, 2017 WL 3309758, at *14 (W.D. Okla. Aug. 1, 2017) (quoting *In re Williams*, 558 F.3d at 1137–38).

In this case, Plaintiffs claim that Myriad concealed the acute risk that Myriad would face a day of reckoning for its fraudulent billing practice. Plaintiffs allege that that risk materialized when Myriad disclosed that it had been served with a subpoena from HHS. Further, Plaintiffs

aver that the truth regarding Myriad's fraudulent billing practices was revealed to the market at that time. Plaintiffs advance these allegations primarily on the materialization of a concealed risk theory. They claim that an HHS investigation was foreseeable given Myriad's continuous double billing, and there existed a causal link because the materialization of that risk caused Myriad's stock prices to decline. The court, however, finds Plaintiffs' allegations unavailing.

To establish foreseeability, the risk that materialized must have been "concealed by the misrepresentation." *Nakkhumpun*, 782 F.3d at 1154. The issue with Plaintiffs' foreseeability argument is that Myriad never concealed the risk that an HHS investigation could take place. In Myriad's 2014, 2015, 2016, and 2017 10-Ks, it explained that the healthcare industry is aggressively regulated, and that "severe consequences" could follow if it failed to comply with "the complex federal, state, local, and foreign laws and regulations that apply" to its business. Myriad further warned investors in its 2015 10-K that "[r]eimbursement and billing for diagnostic services is highly complex," and laws prohibiting "fraud and abuse involving state and federal health care programs . . . are interpreted broadly and enforced aggressively by various state and federal agencies, including CMS" and HHS. Moreover, the way in which Myriad was billing under both 81211 and 81213 was no secret. The data that Plaintiffs provided in the Amended Complaint, showing that Myriad billed the same number of tests under 81211 as it did under 81213, was publicly available.[2] Thus, not only did Defendants warn investors of the possibility of regulatory scrutiny, but the manner in which they were billing Medicare was also available to the public. *Cf. Hampton v. Root9B Techs., Inc.*, No. 15-CV-02152-MSK-MEH, 2016 WL 9735744, at *6 n.6 (D. Colo. Sept. 21, 2016), aff'd, 897 F.3d 1291 (10th Cir. 2018)

---

[2] Even though Myriad's practice regarding the -59 modifier was not publicly available, Myriad's practice of billing nearly the same number of tests under both 81211 and 81213 was available to the public through Medicare documents. *See* Def.'s Motion to Dismiss, Ex. H "Medicare Provider Utilization and Payment Data."

(expressing doubt that a "publication . . . which relied exclusively on publicly-available information . . . can constitute the type of 'corrective disclosure'" sufficient to demonstrate loss causation).  Accordingly, the court is unpersuaded by Plaintiffs' arguments under the materialization of a concealed risk theory.

The parties also disagree as to whether the disclosure of a single subpoena in relation to an investigation, without more, reveals fraud to the market for purposes of alleging loss causation.  The Tenth Circuit has yet to opine on this issue.  Nevertheless, the parties cite case law from the Second, Fifth, Ninth, and Eleventh Circuits in support of their respective positions. After examining the relevant case law, the court finds Defendants' argument—that the disclosure of a single subpoena, without any other type of disclosure, is insufficient to reveal fraud to the market for purposes of showing loss causation—to be more persuasive.  *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) ("The announcement of an investigation does not 'reveal' fraudulent practices to the market. . . . Accordingly, we hold that the announcement of an investigation, without more, is insufficient to establish loss causation."); *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("In our view, the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b). The announcement of an investigation reveals just that—an investigation—and nothing more.").  The circuit court cases Plaintiffs cite support this conclusion.[3]  For example, in *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262–63 (2d Cir. 2016), the Second Circuit held that the plaintiffs had pled loss causation when the truth was revealed to the market based on *nine* discrete events.

---

[3] Along with the Second, Fifth, and Ninth Circuit cases, Plaintiffs cite various cases from the Southern District of New York that hold that the disclosure of an SEC investigation can be sufficient to allege loss causation.  *See, e.g.*, *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 428 (S.D.N.Y. 2013).  To the extent the Southern District of New York has adopted such a rule, the court finds the circuit court decisions cited by the parties to be more persuasive.

Likewise, in *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1203 (9th Cir. 2016), the Ninth Circuit held "that the announcement of an SEC investigation related to an alleged misrepresentation, *coupled with a subsequent revelation* of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation." (emphasis added); *see also Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 317 (5th Cir. 2014) (holding that the plaintiffs adequately alleged loss causation based on "a series of *five* partial disclosures") (emphasis added). Because Plaintiffs point to no disclosure beyond that of the subpoena, Plaintiffs' loss allegations are deficient.

As a final matter, Plaintiffs argue that the standard for pleading loss causation is an extremely low bar. *See Dura*, 544 U.S. 347 ("[I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."). However, *Dura* was decided under the notice pleading standard prior to *Twombly* and *Iqbal*. Consequently, the court must consider the language from *Dura* in light of the facial plausibility standard enumerated in *Twombly* and *Iqbal*. Under this view, Plaintiffs' Amended Complaint lacks the "sufficient factual matter" necessary to make their loss causation allegations "plausible on [their] face." *Iqbal*, 556 U.S. at 678.

Accordingly, Plaintiffs have failed to allege loss causation and so to have failed to state a claim for securities fraud under § 10(b).

## II.      Plaintiffs' § 20(a) Claim

Myriad moves to dismiss Plaintiffs' § 20(a) claim against the Individual Defendants based on Plaintiffs' failure to allege any claims under § 10(b). § 20(a) of the Exchange Act states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable

> jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C.§ 78t(a). "[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Fleming Cos.*, 264 F.3d at 1270–71 (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998)). Because Plaintiffs have failed to establish that Myriad was in violation of the securities laws, they have also failed to establish control person liability. Accordingly, the court grants Defendants' motion to dismiss Plaintiffs' § 20(a) claim.

In addition, Plaintiffs ask that the court grant them thirty days to file a motion for leave to amend their already-amended complaint in the event the court grants Defendants' motion. Yet, as described above, Plaintiffs' Amended Complaint suffers from one fundamental flaw—there are no facts to suggest that Myriad committed securities fraud. Thus, permitting Plaintiffs to amend their complaint would be futile. Consequently, the court denies Plaintiffs' request for time to file a motion for leave to amend.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is GRANTED in its entirety, and Plaintiffs' Amended Complaint is dismissed with prejudice. Plaintiffs' request for time to file a motion for leave to amend their complaint is DENIED.

DATED this 25th day of March, 2019.

BY THE COURT:

DALE A. KIMBALL
United States District Judge